GUILFORD, CLARK & WIRES, *Assignees*, v. SMITH, ELDRIDGE & LEE.

*Stoppage in transitu.*

When goods are delivered at a place where they will remain until a fresh impulse is communicated to them by the vendee, the *transitus* is at an end, and the vendor's right of stoppage *in transitu* ceases.

P. & Co., residing at Burlington, purchased flour on credit of G. H. & Co. at Toronto, C. W., and ordered it shipped to their agents F. & H. at Ogdens-

5

Guilford et als. *v.* Smith et als.

burg, N. Y., who were in the habit of receiving P. & Co.'s flour, and forwarding it as directed by them. The bill of lading described F. & H. as consignees, but mentioned the flour as "to be forwarded to P. & Co., Burlington." The flour arrived by steamer at Ogdensburg, whence there was a railroad to Burlington. Neither the freight, nor the government duties having been paid, the flour was placed, subject to the provisions of the U. S. warehousing system, in a warehouse belonging to the R. R. Co., but under the charge of the owners of the steamboat, from which warehouse it could not be moved until the freight and duties were paid, or the latter were secured according to the U. S. laws; neither would the flour have been forwarded from Ogdensburg until so ordered by F. & H. P. & Co. having become insolvent, and F. & H. having been directed by their assignees to hold said flour for them, notified the warehouseman to retain the flour until further orders. *Held,* that, under these circumstances, G. H. & Co. could not exercise the right of *stoppage in transitu* over the flour.

In such a case, G. H. & Co. having taken the flour from the warehouse under a claim of a right of stoppage *in transitu,* first paying the freight and giving the requisite custom house bonds under the warehousing system, and P. & Co.'s assignees having subsequently replevied the flour, it was held that G. H. & Co., having wrongfully taken the flour, acquired *no lien* thereto against the plaintiffs, by reason of paying the freight or giving the necessary custom house bonds, which had become forfeited on account of the replevy and subsequent sale of the flour by the plaintiffs.

REPLEVIN for three hundred and sixty-eight barrels of flour. The cause, by consent of the parties, was referred to Hon. HILAND HALL, to be decided by him according to law; and by the terms of the reference, the referee was to make a special report to the court, and judgment to be rendered on the report by the court as on a special verdict.

The referee reported as follows:

"The plaintiffs are assignees of J. & J. H. Peck & Co., who, previous to the 10th of October, 1854, were merchants residing, and having their place of business at Burlington, in this state. The flour in controversy, had been purchased for them in Canada by Gooderham, Howland & Co., produce dealers, having their place of business in Toronto, and had been transported by water to Ogdensburg, N. Y., where it was arrested by the said Gooderham, Howland & Co., under a claim of right to *stop it in transitu ;* and having thus resumed the possession of the flour, they caused it to be bonded for internal transportation, under the laws of the United States, and consigned it to Kelly & Spring, their agents,

Guilford et als. *v.* Smith et als.

Boston; while being transported on the railroad route from Ogdensburg to Boston, it was replevied by the plaintiffs at Essex, in this state, from the possession of the defendants, who had it in charge as common carriers.

"The only question litigated before me was, whether Gooderham, Howland & Co. were the legal owners of the flour by virtue of their stoppage of it at Ogdensburg. The plaintiffs claimed, that G. H. & Co. did not stand in such a relation to Pecks & Co. as entitled them to exercise the right of *stoppage in transitu;* and, secondly, that if they stood in such a relation, the right was not exercised in due time.

"The particular facts of the case, as shown before me, were as follows:

"On the 4th of September, 1854, after some previous correspondence between them, in regard to the market for flour and wheat, and the opportunities for obtaining a credit at the banks of Toronto, Pecks & Co. wrote to G. H. & Co. as follows:

"'We conclude to try your market for flour and wheat, and herein hand you our five drafts to your order on Messrs. C. P. Peck & Co., New York, for two thousand dollars each, the proceeds of which you will please invest in good, sound, white winter wheat; in the absence of wheat, a good sound grade superfine flour, and forward to Flagg & Hyde, agents, Ogdensburg, securing as favorable freight as possible, and advise us by *telegraph* and *letter* of shipment, the first to cover name of craft, whether sail or steam, and shipment, that we may insure. We leave the time and date of drafts blanks for you to fill when used, and advise us accordingly. Please negotiate for as *favorable time as possible;* would like a portion ninety days, if you can accomplish it; will thank you to divide the time as much as possible, to avoid their maturing too near together.'

"On the 12th of September, G. H. & Co. telegraphed to Pecks & Co. as follows: 'Can close three thousand barrels flour, eight and quarter, deliverable at Ogdensburg. Answer here.'

"To which Pecks & Co. replied the same day: 'Will take it, if good flour from winter wheat — negotiate as long as possible.'

"On the 13th of September, after receiving this communication, G. H. & Co. wrote to Pecks & Co., that in consequence of a decline

in the market, they thought best not to purchase the three thousand barrels, but would make small purchases at current rates, for a few days, and advised of a purchase of one hundred and eighty barrels flour on the 12th of September. In execution of the instructions of Pecks & Co., G. H. & Co. purchased in their own names, and paid for one hundred and eighty barrels of flour on the 12th of September, three hundred barrels on the 18th, and two hundred and sixty-five barrels on the 20th of September, 1854, and at the respective dates of the purchases charged the same to the Messrs. Pecks in account, the names of the Pecks not being in any way used in the purchases. G. H. & Co. dated three of the drafts sent them by Pecks & Co., on the 13th, 18th and 22d of September. respectively, making each of them payable in sixty days from date, which drafts were discounted at certain banks in Toronto, at their several dates, and their proceeds credited to Pecks by G. H. & Co. in account. G. H. & Co. had an arrangement with these banks under which they were allowed to draw on their own account, or on paper of their customers, indorsed by them at their election. Said drafts came within the description of paper embraced by said arrangement, and they were discounted wholly on the credit of G. H. & Co., the indorsers. Two of the five drafts received from Pecks & Co. were not used by G. H. & Co., but were returned to the plaintiffs by the counsel for the defendants at the hearing before the referee.

I further find that it was contrary to the rules of said banks to discount paper upon the credit of parties residing out of Canada ; that the Messrs. Pecks, the drawers, were unknown to the officers of the banks ; that no inquiry was made by the officers in regard to them, and that the drafts were discounted on the credit of the indorsers ; and that, when thus discounted the proceeds were placed on the books of the banks to the credit of the indorsers in their general account. William P. Howland, one of the firm of Gooderham, Howland & Co., a witness introduced by the defendants, was inquired of by the defendants' counsel in regard to his understanding of the position of his firm towards the Messrs. Pecks, in making the purchases of the flour, and testified that the drafts of the Pecks were not received by them in payment of the flour, but that they understood they were purchasing the flour for the Pecks and giv-

ing them a credit for sixty days, payable in New York, and were to be repaid with their commissions when the drafts came to maturity, which testimony was objected to by the counsel for the plaintiffs, but admitted by the referee, and from which testimony, in common with the correspondence above referred to, I find the facts to have been as testified to by the witness.

" G. H. & Co. charged two and one-half per cent. commission on their purchases. If they had been furnished with cash they would have charged but one and a half per cent.

"I further find that the first two drafts, of September 12th and 18th, were accepted by C. P. Peck & Co., but were protested for non-payment when they respectively became due, and that the third draft, dated September 22d, was protested for non-acceptance October 28, 1854; that the firm of G. H. & Co. had due notice of such protests, and that they paid and took up the same a few days after such protests; that when they paid the drafts, they charged the payments to the Pecks in their general account; and that it was their custom, when they received notes or drafts from their customers, to give credit for them on their books, and to charge them over when dishonored, as they had done in this case.

" They have received no payments on said drafts from any party. There was no evidence that J. & J. H. Peck & Co. had received any notice of the protest of either of said drafts, but it appeared that the said Pecks had not, at the time the drafts were drawn nor at any time afterwards, any funds in the hands of C. P. Pecks & Co., the drawees, for the payment of the same; and that the drafts were drawn solely for the accommodation of J. & J. H. Peck & Co.

" Of the flour thus purchased by Gooderham, Howland & Co., one hundred and fifty barrels were forwarded by them, by the steamer Boston, from Port Darlington, in Canada West, September 12th, consigned by their direction, as per the following bill of lading :

"' PORT DARLINGTON, 12th Sept., 1854.

"' Shipped this day by the Port Darlington Harbor Co., on board the steamer Boston, whereof Sinclair is master, the undermentioned property, in apparent good order and condition, to be delivered in like order and condition (the dangers of navigation

Guilford et als. *v.* Smith et als.

only excepted) unto Messrs. Flagg & Hyde, charges and freight payable by consignees, Ogdensburg:

| Marks and Nos. | Pieces, description of property. | Charges. | Owners. |
|---|---|---|---|
| " ' Ontario, I. A. V., | 90 bbls. flour extra superfine. | | Gooderham, Howland |
| " ' Mills, T. C. S., 60 | " " " " | | & Co., Toronto. |
| | 150 | | |

" ' To be forwarded to J. & J. H. Peck & Co., Burlington.

" ' Shippers charges, two pound five shillings, charged the boat.

" ' Consignees, Messrs. Flagg & Hyde, Ogdensburg.

" ' P. D. H. Company,

" ' C. W. Carmichael.'

" One hundred barrels more of said flour, denominated ' Laskey,' consigned as above, were forwarded by the same steamer, October 2d, 1854. Both of these lots reached Ogdensburg, were placed by the carriers in the Canada warehouse, so called; and from thence, by direction of Flagg & Hyde, transferred by the carriers to the cars of the Northern Railroad, and forwarded to Pecks & Co., Burlington, where they arrived by regular course of transportation.

" The only other flour of the beforementioned purchases, which was forwarded, were the three hundred and sixty-eight barrels in controversy. They were shipped on board the steamer May Flower at Port Darlington and Toronto, October 7th, 1854, and, by direction of G. H. & Co., consigned to Flagg & Hyde, Ogdensburg, to be forwarded to J. & J. H. Peck & Co., Burlington, as per bills of lading, similar to the one above given. This flour reached Ogdensburg in said steamer on Sunday the 8th day of October, and was landed and placed by the carriers in said Canada warehouse on Monday, the 9th of October, where it remained under the circumstances hereafter stated, until the 23d of October, when by direction of G. H. & Co., it was forwarded by the Northern Railroad, consigned to Kelly & Spring, Boston, and on its way to Boston was replevied in this suit at Essex, October 25th, 1854, as before stated.

" The firm of J. & J. H. Peck & Co. became insolvent and made an assignment to the plaintiffs for the benefit of their creditors the 10th day of October, 1854, which assignment embraced the flour in controversy, and no question is made but that proper copies were duly filed in the county clerk's office in conformity to the act of November 19th, 1852.

" The firm of C. P. Peck & Co., of New York, became insolvent as early as October 15th, 1854, and both firms continue insolvent.

" The steamers Boston and May Flower, by which the flour was forwarded from Canada, formed a regular transportation line from Hamilton, in that province, to Ogdensburg, touching at intermediate ports, and were under the control and management of Stark, Hill & Co., whose office and place of business was at Ogdensburg, Mr. Stark being the only acting member of the firm.

" These boats, in the carriage of freight and passengers, ran in connection with the Northern Railroad, which extended easterly from Ogdensburg to Rouse's Point, *en route* to Burlington and Boston. At, or near the western terminus of the railroad, the railroad company have erected the warehouse before mentioned, called the *Canada warehouse*, in which all goods brought by the steamers from Canada were placed, and from whence, when they were transported on the railroad, they were loaded into the cars. This warehouse was in the possession and under the management of Stark, Hill & Co., who received and took charge of all goods which were on transportation by said railroad and steamers to and from Canada, and placed them either on board the steamers or on the cars, according to their direction, giving their receipt for such as were for the steamers, and taking receipts from the railroad company for such as were placed in the cars, and while goods were thus in the hands of Stark, Hill & Co., between the steamers and cars, they were responsible for the same, having the key and control of said warehouse for said purposes by virtue of a contract with the railroad company.

" George Parker was the agent of the Northern Railroad Company at Ogdensburg, and had the general charge of the freight, freighting and freight buildings of the company, except so far as his authority might be limited by the contract before mentioned between the company and Stark, Hill & Co.

" J. & J. H. Peck & Co. had been accustomed to deal in flour and produce purchased at the west, and Flagg & Hyde were their agents for the purpose of receiving it at Ogdensburg, and of forwarding it as directed by them.

" The said Pecks had a warehouse of their own at Ogdensburg, and usually kept more or less freight there, which was forwarded

from there to their customers by Flagg & Hyde, as directed by them, or when sold by Flagg & Hyde.

" It did not appear that any flour which had arrived from Canada, or had been placed in said Canada warehouse, had thus been disposed of at Ogdensburg.

" Flagg & Hyde had a place of business and a storehouse of their own about a mile from said Canada warehouse. Flour arriving at Ogdensburg from Canada was subject to the United States custom house regulations, and before flour thus arriving and placed in the Canada warehouse could be forwarded by railroad, it was necessary that the duties should either be paid, or that bonds should be given for its transportation and delivery to the proper officer of the customs at some other named port of the United States, and the duties might there be paid.

" Stark, Hill & Co. were accustomed to give bonds for the inland transportation of goods arriving by said steamers and transported on said railroad, and to charge their expenses and fees upon the goods, to be collected with other charges, at the place of destination.

" The two hundred and fifty barrels before received from Gooderham, Howland & Co. had thus, by direction of Flagg & Hyde, been forwarded to J. & J. H. Peck & Co., Burlington. None of the flour would have been forwarded to the Messrs. Pecks, Burlington, from Ogdensburg, unless directed to be done by Flagg & Hyde. The three hundred and sixty-eight barrels of flour in controversy, were unloaded from the steamer into the said Canada warehouse on Monday, the 9th of October, 1854, as before stated. While said flour was unloading, Flagg came into the warehouse and was informed of its arrival, and on being inquired of by Stark if he should forward it to the Pecks and charge over to the railroad company, or whether they (Flagg & Hyde) would bond it and forward it themselves, Flagg answered, that he (Stark) had better forward it as usual and have the charges follow. On the 10th of October, Flagg received from the plaintiffs in this case, the following telegraph dispatch of that date from Burlington.

" ' The flour you hold, and to arrive in the name of J. & J. H. Peck & Co., has been assigned to us. Hold it subject to our order."

" Upon the receipt of this dispatch, Flagg went to the said ware-

Guilford et als. *v.* Smith et als.

house and countermanded his previous order to forward the flour, and gave directions to have it remain in the warehouse for further orders; and in consequence of such directions the flour was not forwarded under the previous order. On Friday, the 13th of October, N. K. Herrick arrived at Ogdensburg with the letter of instructions of the plaintiffs, assignees of Pecks, to take possession for them of said flour and to hold it subject to their further order.

" Herrick and Flagg went on that day to the said Canada warehouse, saw the flour, and counted the barrels, and bored into some of them to examine the quality, but did not see Stark, or give any directions then about the flour. They then, on the same day, went to the office of said George Parker, freight agent as before stated, and showed him the letter of instructions, and he read it, and Herrick told him to hold the flour for the assignees ; to which he made no objections. In a few minutes, and before the said Herrick and Flagg had left the office, Parker received a telegraph dispatch from Gooderham, Howland & Co., of that day's date, directing him to hold the flour for them, which he read to Herrick and Flagg, and when they left the office he told them he should hold on to the flour, as both the consignors and consignees wished it. On the same day Parker notified Stark of the failure of the Messrs. Pecks, and of the claims of Messrs. Gooderham, Howland & Co., and of the assignees, and told him to hold on to the flour ; and he told Parker he should hold it, first for the charges of the steamers, and next for G. H. & Co. On Monday, the 16th of October, Herrick for the first time called on Stark, and inquired if Stark would deliver the flour to him if the charges were paid. Previous to this, William P. Howland, of the firm of G. H. & Co., had come to Ogdensburg and made his claim to the flour of the said Parker and Stark in person. In answer to the inquiry of Herrick, Stark told him he would not deliver the flour to him on such payment of charges ; that Howland, one of the consignors, was there, and that what they agreed to he would comply with.

" It did not appear that previous to this time any request had been made for the delivery of the flour either to Flagg & Hyde or to Herrick, or that any offer had been made by them to pay charges upon it, or that any demand had been made on them for such charges.

Guilford et als. *v.* Smith et als.

" From this time the flour remained in the said warehouse, in the custody of the said Stark, Hill & Co., until the 23d of October, when, at the request of G. H. & Co., it was bonded at the custom house for internal transportation to Boston, and forwarded by railroad, consigned by them to Kelly & Spring as before stated, the said G. H. & Co. being holden to indemnify them against their said bonds.

" While the flour remained in the *Canada* warehouse, being subject to custom house regulations, it would not have been delivered by Stark, Hill & Co. either to Flagg & Hyde or Herrick, or any other party, unless the duties had been paid or provision made for bonding it for internal transportation.

" Neither J. & J. H. Peck & Co. nor their assignees, either by themselves or their agents, took any other steps in regard to the possession of the flour in controversy than those above mentioned.

" The charges of Stark, Hill & Co. on the said three hundred and sixty-eight barrels of flour, being principally for steamer freight, were paid by G. H. & Co.

" The charges of the railroad carriers for storage and transportation from Ogdensburg to Essex, and thence to Burlington, of the flour in controversy, were paid by the plaintiffs, on the removal of the flour from the cars.

" The custom house bond, given by Stark, Hill & Co., for the transportation of the flour to Boston, has become forfeited by the replevin of the flour and its subsequent sale without the payment of duties, but the bond has not yet been prosecuted or paid.

" Upon the foregoing facts I am of opinion that the flour in controversy at the time it was replevied, was not the property of the plaintiffs, but was the property of Gooderham, Howland & Co., and lawfully in the custody of the defendants, and I accordingly award and report that the defendants are entitled to have the flour so replevied returned to them, together with the sum of two hundred and forty-two dollars and fifty cents damages and costs of suit."

In the county court the plaintiffs excepted to the foregoing report ; but the county court—PIERPOINT, J., presiding—at the November Term, 1855, rendered judgment, *pro forma*, for the defendants for the damages reported, a return of the property replevied, and costs. Exceptions by the plaintiffs.

Guilford et als. *v.* Smith et als.

*Geo. F. Edmunds, Jacob Maeck* and *S. Wires*, for the plaintiffs.

I. The relation between Pecks & Co. and Gooderham, Howland & Co. was not such as gave to the latter the right to stop the flour *in transitu. Pingrey* v. *Watkins,* 17 Vt. 380 ; *Hakes* v. *Hotchkiss,* 23 Vt. 231 ; *Herrick* v. *Nobles,* 27 Vt. 1 ; *Durkee* v. *Vt. Cent. R. R. Co.,* 29 Vt. 127 ; *McCluskey* v. *Cromwell,* 1 Kern. 593 ; *Key* v. *Cotesworth,* 14 E. L. & Eq. 435 ; *Siffkin* v. *Wray,* 6 East 371 ; *Bird* v. *Brown,* 4 Exch. 786 ; *Hutchins* v. *Olcott,* 4 Vt. 549 ; *Chapman* v. *Searle,* 3 Pick. 38 ; *Hammond* v. *Buckmaster,* 22 Vt. 375.

II. But if the right to stop *in transitu* did ever exist, it had ceased before the seizure was made.

It is true that, in the infinite number and variety of cases upon this subject, there is more or less of conflict, real or apparent; but the leading principle to be applied to each case seems to be, If the goods are still on their *passage* from the vendor to the vendee, or are still in the hands of the carrier *as such,* merely, the right exists ; but if the *passage* is ended, and the original impulse given them by the consignor is exhausted, so that they will proceed no further without a new direction from the vendee, then the right is gone. *Sawyer* v. *Joslin,* 20 Vt.

Here the contract was, that the flour should be consigned to Fagg & Hyde, Ogdensburg; and it was so shipped, although the shipping lists (there was no bill of lading) stated that it was to be forwarded to Burlington.

It was not the purpose of the Pecks to have it forwarded to Burlington, rather than to any other place; whither it should go from Ogdensburg, depended wholly upon the market they might find for it.

It would not have proceeded beyond that point without new directions from the Pecks or their agents.

It is clear, then, that the legal destination of the flour was Ogdensburg, and that its *transitus* ended there. Abbott on Shipping 523; 5 East 175, *Dixon* v. *Baldwin;* 1 Rawle 9, *Bolin* v. *Huffnagle;* 8 M. & W. 431, *Jones* v. *Jones;* 56 E. C. L. 837 *Valpy* v. *Gibson.*

The *transitus* to Ogdensburg had ended. The flour had arrived

and been discharged from the vessel of the carrier into a ware-house where *all* goods from Canada, whether having a further destination or not, were deposited.

The warehousemen had taken the place of the carrier as such. The Pecks by their agents, the consignees, had made a new bar-gain with the warehousemen to forward the flour to the Pecks, and to let the charges follow (which included the necessary customs proceedings) ; and the agent of the plaintiffs had countermanded those arrangements, and had ordered the warehousemen to hold the flour subject to further orders; *in consequence of which direc-tions the warehousemen retained the flour.*

This was, it seems to us, clearly the substitution of a new rela-tion between the warehousemen and the vendee and their assignees, in the place of the naked custody which the carriers and ware-housemen had of it before for delivery, on payment of charges and customs.   They thereby became the holders of it as mere agents and servants of the plaintiffs, and under their dominion, subject to the payment of duties and charges, in just the same way as if it had been delivered to Flagg & Hyde, subject to the same liens ; for, *when the directions of the plaintiffs as to its disposition had been obeyed, and a different thing was in consequence done with it, than would have been done had the direction not been given, the act of retaining it was, to all intents, the act of the plaintiffs.* *Jones* v. *Jones, ante ;* 3 Term 464, *Ellis* v. *Hunt ;* 13 E. C. L. 111, *Foster* v. *Frampton ;   Valpey* v. *Gibson, ante ;* 10 M. & W. 436, *Wentworth* v. *Outhwaite ;* 8 Taunt. 83, *Rowe* v. *Pickford ;* 2 Kent's Com. 545 ; Long on Sales 309, *et seq ;* 2 Bos. & P. 320, *Leeds* v. *Wright ;* 9 M. & W. 518, *Whitehead* v. *Anderson ;   Key* v. *Cates-worth, ante ;* Angell on Carriers secs. 339–347 ; Paley on Agency 348 *et seq. ;* 43 E. C. L. 1078, *Dodson* v. *Wentworth.*

It is not necessary that the Pecks or the plaintiffs should have had an *absolute* right to take possession without paying the duties or charges.

If the duties or charges are not paid, that is a *circumstance* bearing upon the inquiry as to the *character* of the possession of the carrier or warehousemen ; beyond that it has no influence.   If the duties and charges are not paid, and no  other fact exists, it is fair to presume that the carrier, warehousemen, or public store-

keeper hold possession *exclusively* in their original capacity, and independent of any dominion of the vendee; but where it appears that they do not hold thus independently, but under the instructions of the vendee, the fact of the non-payment of duties and freight loses its significance. 1 Denio, 483, *Mottram* v. *Heyer;* 2 Cr. & J. 218, *Allan* v. *Gripper;* 2 B. & Cr. 540, *Hawes* v. *Watson;* 7 Bing. 339, *Gosling* v. *Birnie; Rowe* v. *Pickford, ante; Dodson* v. *Wentworth,* 43 E. C. L. 555.

It then becomes purely a question between the carrier and vendee. It has no longer any tendency to show that the *transitus* continues; and although the judgment of the supreme court in *Mottram* v. *Heyer,* was in this particular afterwards doubted by some of the members of the court of errors (5 Denio 629), it is even there conceded that in a case of bonding such as was agreed upon in this case, the rule would be as decided below, and the judgment was affirmed as much on this point as on the other.

Again: before G. H. & Co. did any act in the premises, the plaintiffs, by their agent, went to the warehouse and counted the barrels, bored into some of them, and then gave notice to the general agent to hold for them, and read the letter of instructions offering to pay freight; and although by the contract of Stark, Hill & Co. with the N. R. R. Co., they were intrusted with the management of the warehouse, it was expressly provided that, " that arrangement should not effect the custody or control of the property," &c. Thus the Pecks and the plaintiffs, before G. H. & Co. had acted, had exercised unequivocal acts of ownership over the flour ; they had made new arrangements for the payment of duties and charges, and for its reshipment ; they had given new orders as to it, which had been obeyed, and recognized by the persons in possession ; they had made an actual inspection and enumeration of it; and had formerly notified the general agent to hold for them, and expressed a willingness to pay the charges. They had done everything which evinced ownership and possession, short of actual removal. And all this had been done with the intention, and for the purpose of asserting the right of the Pecks and the plaintiffs to the property, as owners.

III. If G. H. & Co., then, had no right to retake the flour, but wrongfully seized it, paid the charges and gave a bond for the

Guilford et als. *v.* Smith et als.

duties, the plaintiffs had a right to resume the possession without repaying them, for, as wrong doers, they could create no responsibility upon the part of the plaintiffs to them, for their unauthorized act.

*Roberts & Chittenden,* for the defendants.

I. Gooderham, Howland & Co. were substantially the *vendors* of the flour to Pecks & Co , and had the right of *stoppage in transitu.* Abbott on Shipping 516; *Feise* v. *Wray,* 3 East 93; 1 Smith's Lead. Cas. 743–761; 1 Parsons on Contracts 481; *Newhall* v. *Vargas,* 13 Maine 93; *Illsley* v. *Subbs,* 9 Mass. 65; *Bell* v. *Moss,* 5 Wharton 72; *Edwards* v. *Brewer,* 2 M. & W. 375; *Newson* v. *Thornton,* 6 East 376; *Jenkins* v. *Osborne,* 7 Man. & Gr. 678; *Clark* v. *Perrin,* 2 Freem. 48; *Prince* v. *Clark,* 1 B. & C. 186; Chitty on Bills 173, (note 2); *Hutchinson* v. *Olcott,* 4 Vt. 549; *Follett & Bradley* v. *Steele,* 13 Vt. 452; *Heald* v. *Warner,* 22 Vt. 413; *Farr* v. *Stevens,* 26 Vt. 299; *Franklin* v. *Vanderpool,* 1 Hall 78; *Tracy* v. *Pearl,* 20 Vt. 163.

II. The right of stoppage was exercised in due time. *Burlington* was the place of ultimate destination of the flour. Pecks & Co. resided there, and there was their place of business. All previous lots had been forwarded to Burlington. The directions accompanied the property, as expressed in the bills of lading, " to be forwarded to J. & J. H. Peck & Co., Burlington." The plaintiffs describe the flour as in transit to Burlington *via* Ogdensburg. *Ogdensburg* was *not* the place of ultimate destination. Although Pecks & Co. had a warehouse there, yet no Canada flour was received or sold there.

And although the bills of lading name as " *consignees,* Flagg & Hyde, Ogdensburg," yet the case finds that Flagg & Hyde were mere " *agents* of Pecks & Co., for the purpose of receiving flour at Ogdensburg and of *forwarding* it as directed."

In the letter of September 4th, Flagg & Hyde are named in this manner: " Forward to Flagg & Hyde, *Agents,* Ogdensburg." Flagg & Hyde therefore, being mere forwarding agents, were themselves middle-men between vendor and purchaser, and whether employed by the one or the other is immaterial.

In this view, the right to stop the flour would have existed, even

if it had come into the actual possession of Flagg & Hyde. But if Ogdensburg could in any sense be said to be the place of ultimate destination, it was not Ogdensburg generally, but Flagg & Hyde's in Ogdensburg.

They had a warehouse and establishment of their own, but it was a mile distant from the " Canada Warehouse," where this flour was deposited.

When the flour arrived at Ogdensburg it was removed from the vessel and deposited in the Canada warehouse. It was then in a place distinctly connected with the transmission of the property—in the hands of Stark, Hill & Co., carriers, to be forwarded by other carriers—Stark, Hill & Co. having the key and control of the warehouse, and being responsible for the flour— charges unpaid and so subject to the carriers lien — duties unpaid, and the flour awaiting entry at the custom house.

Manifestly, until Stark, Hill & Co. had thrown off the character of carriers, and assumed some new relations to the vendees, and become, through some arrangement with them, mere bailies to keep, the property was still in transit, and had not come to the possession, actual or constructive, of Pecks & Co. Abb. Sh. 524 ; *Northey* v. *Field,* 2 Esp. 613 ; *Donath* v. *Brownhead,* 7 Barr 301 ; *Tanner* v. *Scovill,* 14 M. & W. 28 ; *Sawyer* v. *Joslyn,* 20 Vt. 172 ; 1 Pars. Cont. 482–3 ; 1 Smith's L. C. 764 ; 3 Steph. N. P. 2588 and *seq. ; Jackson* v. *Nichol,* 5 Bing. N. C. 50 ; *Stubbs* v. *Lund,* 7 Mass. 453 ; *Buckley* v. *Furness,* 17 Wend. 504 ; S. C., 15 Wend. 137.

Howland & Co., by the bills of lading in which they describe themselves as *owners,* and direct that the flour is to be forwarded to Burlington, both preserved and indicated their right to stop the goods at any time before they should reach Pecks & Co., in Burlington. *Turner et al.* v. *Trustees of Liverpool Docks,* 6 Eng. Law and Eq. 507. Nothing done by Flagg amounted to a taking of possession. October 9th, he advises, on being applied to, that the flour be forwarded, charges to follow. October 10th, he countermanded this order, and gave directions to have the flour remain for further orders. This left matters just as they stood at first. The property was still subject to charges, and would not have been delivered without the payment of both charges and duties. Stark did not agree to keep the property for Flagg, nor for Pecks & Co.

He was a carrier still, and assumed no new relations. 2 Kent's Com. 545 ; *Hays et al.* v. *Mouille & Co.*, 14 Penn. 48 ; *Whitehead* v. *Anderson*, 9 M. & W. 534. So what was done by Flagg and Herrick on the 13th, was no taking of possession.

The notice to Parker was nothing, for two reasons : First, because it was a mere notice ; secondly, because he had not the custody of the property. Again, Parker did not agree to keep the property *for* either party ; but said as *both* parties wished it, he should hold on to it.

Stark being informed by Parker the same day of their respective claims, says he shall hold on to the flour, first for the charges of the steamer and then for G. H. & Co. Before any application to Stark by Flagg or Herrick, G. H. & Co. had given him notice of their claim, which he recognized and thereupon paid charges and took possession. Abb. on Ship. 527, 528.

An offer to return the bills was not necessary before stoppage. So to hold would in many cases render the right valueless. *Hays et al.* v. *Mouille, supra ; Edwards* v. *Brewer*, 2 M. & W. 375.

The opinion of the court was delivered by

BENNETT, J. This case, having been before the court for some length of time, and having also had the full and matured consideration of counsel, it is proper that it should be disposed of without further delay. It need hardly be observed that the plaintiffs stand upon the rights, as derived by them from J. & J. H. Peck & Co., and the defendants upon the rights of Gooderham, Howland & Co. Upon the ground which we are about to put the case upon, we shall assume that Gooderham, Howland & Co. were substantially the vendors of the flour, and J. & J. H. Peck & Co. the vendees, although we think it is attended with considerable difficulty to establish that point ; and we do not intend, in making this decision, to express any opinion upon it. We shall confine our inquiry to the question, whether the right of stoppage was exercised in due time, provided it once existed. This right must be exercised after the property has left the possession of the vendors, and before it has come to the actual or constructive possession of the vendees, or those standing in their place. This period covers the whole transit. The rule is explicit, and the difficulties arise

in its application, in determining the capacity in which a third person holds the goods before they have come to the actual possession of the vendee.  If he holds them for the mere purpose of transport in the course of their transit to the vendee, or to their ultimate place of destination, the goods in such third person's hands, are still *in transitu* and may be stopped, not because the delivery to such third person was not a constructive delivery to the vendee, but because it was a delivery *to transport*, as a connected link in the transmission of the property to the vendee.  As a general rule, a constructive possession in the vendee is as available to put an end to the transit, as an actual one can be, and it is only when the constructive possession is for the purpose of transport, that an exception to the general rule is found.  A middleman simply to *forward*, is no more the agent of the vendor than of the vendee.  The title of the property passes from the vendor to the vendee upon the sale, and when it is once delivered to the carrier, the vendor has only the right of stoppage in cases of insolvency while it is *in transitu*.  The property while in transit, is ordinarily at the risk of the vendee, and mere middle-men are more peculiarly the agents of the vendee than of the vendor. The rule is well settled by authority, that when the goods are delivered at a place where they will remain until a fresh impulse is communicated to them by the vendee, the *transitus* is at an end. Such is the doctrine of *Dixon* v. *Baldwin*, 5 East 175, and in subsequent adjudged cases.  In such a case, the delivery is not to transport but to keep, and a constructive possession will determine the transit.  The inquiry then is, in what capacity did Stark, Hill & Co. hold the flour on the 13th day of October, when Gooderham, Howland & Co. claimed the right to stop it ?  Did they hold it *to transport?* or was it a custody *to keep*, subject to the orders of the Pecks or their assignees ?  Though Stark, Hill & Co. were the carriers of this flour to Ogdensburg, yet when it was in the warehouse they held it as warehousemen, and ceased to be liable as carriers.  The case finds that the warehouse was in their possession and under their management, and that they received and took charge of all goods which were on transportation to and from Canada by railroad and steamers ; and while the goods were thus in the hands of Stark, Hill & Co. between the steamers and the

6

cars, they were responsible for the same, having the key and control of the warehouse for such purpose. Although Stark, Hill & Co. may have had the possession of the flour as warehousemen, still the question remains, did they hold it *to transport*, or for the purpose of *custody?* To determine this we have only to look at the facts in the case.

The direction given by the Pecks to the vendors, is to forward the flour to Flagg & Hyde, their agents at Ogdensburg, where, it is found, the agents had a fixed place of business, and the vendors were to advise the Pecks of the shipment by telegraph. There is no allusion in the instructions of the Pecks to the vendors, to any ulterior destination of the flour beyond Ogdensburg, and if there had been, it would not have been a matter of much moment. It is found by the referee "that the Pecks had been accustomed to deal in flour at the west, and that Flagg & Hyde were their agents for the purpose of receiving it at Ogdensburg and forwarding it *as directed by them.*" This does not import a direction to forward the flour to Burlington, or any particular point, but rather to hold it, subject to the order of the Pecks as to the time and place to which it was to be forwarded, and the referee expressly finds that none of the flour would have been forwarded from Ogdensburg to Burlington *unless directed to be done by Flagg & Hyde.* As to that part of the flour purchased by Gooderham, Howland & Co. for the Pecks which actually reached them at Burlington, the case finds that it was sent on from the warehouse at Ogdensburg, in which it had been deposited, to Burlington *by the direction of Flagg & Hyde.* All the bills of lading, as they were called, make Flagg & Hyde the consignees of the flour at Ogdensburg, with the exception of one, where the name is left blank, probably by mistake. It is added in the bills of lading, it is true, "to be forwarded to J. & J. H. Peck & Co., Burlington." But this can not supersede the Pecks or their assignees in their rights to control the flour, even while it is in transit; and besides, this ulterior destination of the flour in the bills of lading, was not according to the letter of instructions given to Messrs. Gooderham, Howland & Co., on the 4th of September. When the referee speaks of the flour as being consigned by Gooderham, Howland & Co. to Flagg & Hyde, to be forwarded to J. & J. H. Peck & Co., Burlington, *as per bills of*

Guilford et als. *v.* Smith et als.

*lading*, I should apprehend that all that he meant by this finding was, that the bills of lading indicated the ulterior destination of the flour to be Burlington, and it would seem from the whole report, that this must have been his meaning. But, as it has already been observed, it is not a matter of decisive moment whether Burlington was the ulterior destination of the flour or not. Admitting it to be so, still, if the flour while on its transit reached a point where it would await a fresh direction to be given to it by the Pecks or their agents, the *transitus*, nevertheless, would be at an end. While it was in that situation it would not be held *to transport*, but *to keep*.

The finding of the referee is express that none of the flour would have been forwarded by Stark, Hill & Co. from their warehouse unless directed by Flagg & Hyde. Stark, Hill & Co. treated this flour in their warehouse as subject to the special direction of Flagg & Hyde. While they were putt'ng it into their warehouse, Flagg, happening to be on the ground, was inquired of for directions in regard to it, and Stark, Hill & Co. were ready to comply with his directions in regard to forwarding it. This was on the 9th of October. On the 10th of October, after Flagg had received notice from the assignees directing him to hold the flour subject to their order, he repaired to the warehouse and countermanded his previous order, and gave directions to have the flour remain in the warehouse *for further orders*. The flour did remain in the warehouse, and in consequence of such directions, it was not forwarded under the previous order, and in this situation it remained in the custody of Stark, Hill & Co., in their warehouse, until the 13th of October. On that day and prior to any attempt to stop the flour by Gooderham, Howland & Co., Herrick appeared at Ogdensburg, clothed with full powers from the plaintiffs as the assignees of the Pecks, to take possession of the flour in question. Herrick and Flagg went to the warehouse, saw the flour, counted the barrels and bored into some of them to examine its quality, although they did not see Stark or give any directions, at that time, in regard to the flour. It does appear, however, that Herrick, before anything was done by Gooderham, Howland & Co., showed his letter of instructions from the assignees to Parker, who was the agent of the Northern Railroad Company at Ogdensburg,

Guilford et als. *v.* Smith et als.

and had the general charge of the freight, freighting and freight buildings of said company, except so far as his powers were restricted by the contract between the railroad company and Stark, Hill & Co., and requested him to hold the flour *for the assignees ;* to which Parker, it is found, made at the time no objection. I should apprehend for one, that at that time the flour was subject to the control of Stark, Hill & Co. as warehousemen, and that the direction to Parker to hold it for the assignees, could be of no particular importance to the plaintiffs, excepting as it may go to show an intention on the part of the assignees to take the possession of the flour. It may also, if necessary, go to give character to the acts of Herrick and Flagg at the warehouse, in counting the barrels of flour and taking specimens of its quality by boring into some of the barrels. All this took place before either Parker or Stark, Hill & Co. were requested to hold the flour for the vendors.

It is hardly necessary to vindicate the rule as laid down by Baron PARK, in *James* v. *Griffin,* 2 M. & W. 631, "that when goods are delivered at a point where the vendee intends they shall remain until a fresh destination is communicated to them by orders from the vendee himself, the *transitus* is at an end." In *Dixon* v. *Baldwin,* 5 East 175, the goods were ordered "to be forwarded to one Metcalfe at Hull, *to be shipped for Hamburg as usual.*" It appeared that it was *usual* for Metcalfe to keep such goods until he received orders from the vendees, and then comply with such orders; and it was held the *transitus* ended at Hull, though there was an *ulterior destination* of the goods beyond that place. Lord ELLENBOROUGH said the goods waited for new orders from the purchaser, to put them in motion, and that without such orders they would remain stationary. In *Leeds* v. *Wright,* 3 B. & P. 320, the agent of the bankrupt purchased the goods for exportation, having authority from the bankrupt to export them *to any port he pleased ;* and the court held he did not possess the goods as an agent to forward, and that while in his hands, they were not *in transitu.* In *Scott* v. *Pettit,* 3 B. & P. 469, the bankrupt had given general orders to a carrier to send on his goods to a packer to be packed, and the goods were accordingly sent to the house of the packer, and the packer was not treated by the court as an agent to forward, but it was held that, like a warehouseman, he

held the goods subject to the order of the vendee, and that in his hands the *transitus* of the goods was ended. The case of *Stokes* v. *La Riviere and Lawley,* cited in *Ellis* v. *Hunt,* 3 Term 464, and more fully by LAWRENCE, J., in *Bothling* v. *Ingless,* 3 East. 398, is put upon the ground that the goods were in the hands of the defendants *to be conveyed.* In *Jackson* v. *Nichols,* 5 Bingham, N. C., 508, Justice TINDALL reiterates the doctrine of the case of *Dixon* v. *Baldwin.* The case of *Coats* v. *Railton et als.,* 6 B. & C. 422 (13 Com. Law 196), in principle is much like the case of *Smith* v. *Goss,* 1 Camp. 232, and neither are opposed to *Dixon* v. *Baldwin.* In *Smith* v. *Goss,* the goods were ordered to be sent addressed to the care of Goss, Bull's wharf, London, with directions to send them by the first vessel to New Castle. It might well be held in that case, that the goods in the hands of Goss were *in transitu.* He held them *to transport,* by the first vessel, to their ultimate destination. In *Coats* v. *Railton,* the goods were purchased of the plaintiff by the defendants, as agents for a house at Lisbon, and were to be forwarded to that house at Lisbon by the defendants, who were packers and warehousemen as well as the general agents for the vendees, and it was held that, as the defendants had received the possession of the goods to send them to the vendees at Lisbon, they might be stopped in their hands, and before they reached Lisbon, notwithstanding the defendants made the purchase as the agents of the vendees. All that this case decides is, that after the purchase was made the defendants held the goods *for the purpose of transport,* and that in this case the constructive possession of the goods in the vendees, would not defeat the right of stoppage before they arrived at Lisbon. In short, it simply holds that the purchase of the goods by the defendants, as the agents of the vendees, was an element in the cause and could not control the right of stoppage, arising from the fact that the defendants held the goods subsequent to the purchase for the purpose *of transport.* In *Valpy* v. *Gibson et al.,* 56 Common Law 865, in the letter of advice from the consignors to the consignees, the latter were requested to ship the goods with the letter of advice, "as the bankrupt might direct the same to be shipped;" and though the defendants, who were commission merchants and knew the goods were to be sent by the bankrupt to Valparaiso, so informed the

Guilford et als. *v.* Smith et als.

house to whom they forwarded the goods at Liverpool when they sent them, yet it was held, the house at Liverpool could not act on that information, and that they held them subject to the order of the bankrupt; and that, when the goods had reached the house of the consignees at Liverpool, the transit was ended. Here it should be remarked that the direction was, "*to ship the goods as the bankrupt might direct the same to be shipped.*" With such instructions the consignees received the goods *to keep* and not *to transport.* In principle this case is the same as *Dixon* v. *Baldwin.*

*Foster et als., Assignees of Fowler,* v. *Framp.ton,* 13 Common Law 60 (6 B. & C. 107), is strongly in point for the plaintiffs. There the vendee of several hogsheads of sugar, having had notice from the carrier of their arrival, took samples from them, and directed the carrier to let them remain in his warehouse until he should receive further instructions; and before they were removed the vendee became bankrupt, and it was held the *transitus* was at an end. Justice BAYLEY remarks that the bankrupt, on that particular occasion, used the warehouse of the carrier as his own, and made it the repository of his own goods; and HOLROYD, J., says, "the carrier ceased to be such, and became a mere bailee." The carrier in that case, at least by implication, entered into a new relation, distinct from the contract for the carriage, and held the goods for the vendee as his agent, not to transport but for the custody of them, subject to his order. In *Allan* v. *Gripper,* 2 Cromp. & Jervis 218, the goods had been deposited in the carriers' warehouse for the convenience of the vendee, to be delivered out as he should want them, and it was held the *transitus* was at an end. Here, too, the warehouse in which the goods were deposited might well be considered for this special purpose, as the warehouse of the purchasers. Stark, Hill & Co. from the time the flour was deposited in their warehouse, held it subject to the future order of the Pecks, or those standing in their place, and a fresh direction to them was necessary again to put the flour in motion, and in this view they received the flour *to keep* and not *to transport,* unless directed. The possession of Stark, Hill & Co. was the constructive possession of the Pecks or their assignees, and it may well be said, they made the warehouse of Stark, Hill & Co., for this particular purpose, their own.

Guilford et als. *v.* Smith et als.

Besides, on the 10th of October, the assignees directed Flagg & Hyde to hold the flour for them, and they immediately directed Stark, Hill & Co. to have the flour remain in the warehouse *for further orders*, and in obedience to such order it did remain in their warehouse, and was not sent on in pursuance of the previous order of Flagg & Hyde. Baron PARK, in *Whitehead* v. *Anderson*, 9 M. & W. 518, has well said, "a case of constructive possession is where the carrier enters, expressly or by implication, into a new agreement distinct from the original contract for carriage, to hold the goods for the consignee, as his agent, not for the purpose of expediting them to the place of original destination pursuant to that contract, but in a new character for the purpose of custody on his account and subject to some new or further order to be given him." There can be no doubt this is a case where Stark, Hill & Co., by the strongest kind of implication, assumed to hold this flour subject to the future directions of Flagg & Hyde, who, on the 10th of October, were acting as the agents of the assignees, and this would give the assignees a constructive possession of the flour if there had been nothing else in the case.

The assignees might well treat, on this occasion, the warehouse of Stark, Hill & Co. as their own. The case of *Buckley* v. *Furniss*, 15 Wend. 137, is deemed by the defendants' counsel to be strongly in point, but we think is is quite distinguishable from the case at bar. In that case the iron was marked and directed to Titus, the vendee at Malone, to the care of Thomas Green, Plattsburg, who was a warehouseman at that place, and the court put the case upon the ground that the goods only rested at that place for the purpose of changing the mode of transportation from a water to a land transportation, and that they were not to remain at Plattsburg to await a fresh order from the vendee. This is clearly a case where the warehouseman received the iron *to transport* and not *to keep* until further orders.

It is said in argument that, before the Pecks or their assignees could assert any right to the possession of the flour, it was indispensable that they should have paid the charges and duties on it. But it should be remembered that this is a question between vendors and vendees, and the only inquiry now is, whether the vendors' right of stoppage was at an end, and not whether Stark, Hill &

Co. had a *lien* on the goods for their charges, or the government one for the duties. The vendees might well have a constructive possession of the flour, subject to such *liens*, and it is not for Gooderham, Howland & Co., who are strangers to such liens, to set them up to defeat any rights of the vendees. In *Allan* v. *Gripper*, 2 Crompton & Jervis 218, it was held that the *transitus* was at an end, and the vendor's right to stop *in transitu* gone, although it appeared that the carrier claimed to have a lien on the goods. The payment or the non-payment of the charges and duties, may have some bearing upon the character of the possession which a third person may have, but when it is found that such third person has the custody of the goods to keep for the vendee, and await a further order from him, the non-payment of freight or duties becomes of no importance. The vendee has then a constructive possession, subject to all liens.

The title passes to the vendee upon the sale. In *Mottram* v. *Heyer*, 1 Denio 483, the goods were shipped from England to the vendees at New York, and the circuit judge charged the jury, that by the receipt of the bill of lading, the payment of the freight by the vendees and their entry of the goods at the custom house, the *transitus* was ended, even though in that case the agent of the vendors had demanded the goods before the duties were paid, and while the goods were in the custom house. This ruling was affirmed upon error by the superior court of the city of New York. The case stands upon the ground that the vendees had a constructive possession, though the goods were in the custom house and the duties unpaid. This case went up to the court of errors, and though there was some discrepancy of opinion as to the ending of the transit, yet the judgment was affirmed by a vote of thirteen to four. See 5 Denio 629. Though it is true the chancellor maintains that the entry of the goods at the custom house in that case did not terminate the transit without a payment of the duties also, yet he admits that if the goods had been placed in a public store under the warehousing system, the transit would have ended. His opinion goes upon the ground that, from the facts in that case, enough was not shown to give the vendees a constructive possession without the payment of the duties; but he was for affirming the judgment of the superior court upon the ground that the demand

upon the vendees for a return of the goods, made while they were in the custom house, was not sufficient to stop the goods in their transit. PORTER and PUTNAM both agreed that the transit was not ended. VAN SCHOONHOVEM, Senator, held that the transit was ended, and Senator LOTT gave a written opinion, and JOHNSON, BARLOW and TALCOTT oral opinions in favor of an affirmance, but upon what ground does not appear from the case. All that can be learned from the report of the case on this point is, that the chancellor and two senators held that the transit was not ended at the time the vendors made the demand for the goods then in the custom house. The authority of the case upon this question, as reported in 1 Denio, can not be considered as impeached by the court of errors. The case of *Northey* v. *Field*, 2 Espinasse 613, is relied upon to show that Gooderham, Howland & Co. exercised the right of stoppage in time, it being before the duties were paid; but we apprehend the case will not warrant the position as applied to the facts in the case at bar. The consignees in that case neither had an actual or constructive possession of the wines. The wines remained on board the ship until after the vendees became bankrupt, and the duties not having been paid within the twenty days allowed by the excise law, during which time they are to remain on board, they were taken from the ship to the King's warehouse, in consequence of the non-payment of the duties within the time fixed by the excise laws. The goods remaining in the vessel of the carrier until taken to the government warehouse, and the vendees having no right to an actual possession until the duties were paid, it is clear they could have no constructive possession.

I apprehend in that case the possession of the carrier was still continued, subject to the *lien* of the government for the duties. The vendees not only failed to pay the duties, but did not, as was said by Lord TENTERDEN, enter the goods at the custom house. No act of ownership whatever was exercised by the vendees over the property. See this case in Abbott on Ship. 664, 7th Am. Ed.

*Donath* v. *Brownshead*, 7 Barr 301, is like *Northey* v. *Field*. In that case the goods were removed to the custom house directly *from the vessel* by the officers, and were not entered at the custom house by the consignee, on account of the loss of the invoice. Clearly, in this case, the vendee, though he had paid the freight, had not entitled himself to actual possession, and could have no

constructive possession. It could not be implied in that case, that either the master of the vessel or the agent of the vendee held the custody of the goods *to deliver.*

But in the case before us, the flour had been deposited in the warehouse of Stark, Hill & Co., under the warehousing system, and it was the practice of that firm to give bonds for the inland transportation of goods arriving by steamers, and transported on the Northern Railroad. As I understand the warehousing system as established by act of Congress, it provides that if duties are not paid, or if the importer or consignee shall make an entry in writing for warehousing the goods, they shall be deposited in the public stores, or other stores agreed on, at the charge and risk of the importer or consignee, subject to their order on paying the duties and expenses, to be secured by bonds with sureties. If, however, satisfactory security shall be given that the goods shall be landed out of the jurisdiction of the United States, or on entry for reëxportation and the payment of expenses, etc., the goods may be shipped without the payment of the duties. If the goods shall remain in the warehouse beyond one year without the payment of the duties on them and expenses, they are to be appraised and sold at auction, and the surplus after paying the duties, expenses, etc., is to be paid over to the owner or consignee.

Clearly then, under the warehousing system, whatever possession the government may have of the goods, it is under the owner, and it is at most but a qualified or special possession, and for the purpose of securing a *lien* by way of pledge. The goods were at all times subject to the order of the owner upon payment of duties and expenses. He had the right of actual possession upon the payment of the duties, etc., and his general ownership of the property would, at all events, give him a constructive possession, as against third persons. So far as they are concerned, it is a possession for the owner, and the owner could sell or dispose of the goods as he should see fit, subject to the duties and expenses. Granting then, that the right of stoppage existed in this case, we think the *transitus* was ended before there was an attempt to exercise it, and that Gooderham, Howland & Co. must be regarded as trespassers in taking this property from the warehouse on the 23d of October. Though we should be glad to have Gooderham, Howland & Co. indemnified against the bond given to secure the pay-

ment of the duties, and also for the charges paid Stark, Hill & Co., yet, being wrong-doers in taking the property, they could acquire no *lien* upon it, and the assignees of the vendees were entitled to replevy the property without tendering or paying to Gooderham, Howland & Co. the charges paid by them and the duties which their bond obligated them to pay. The general principle is, that a right to a thing carries with it a right to all it produces, and to all that becomes united, attached or interwoven with it, so long as its identity is not destroyed. If a man wrongfully converts my saw-mill logs into boards, the boards are mine, and he can claim no compensation for his labor in the commission of the trespass; he can have no *lien* upon the boards for sawing the logs. So in this case Gooderham, Howland & Co. were mere volunteers in the payment of the freight and charges to Stark, Hill & Co., and in securing the duties; and, as we find they had no right to repossess themselves of the flour, they clearly could not set up a *lien* to defeat this action. Whether there are any principles in equity law which can be invoked to make them good for the disbursement made by them, which the plaintiffs would otherwise have been compelled to have made before they could have availed themselves of the property, it is not necessary to inquire. The defendants in their avowries, put themselves upon the rights of Gooderham, Howland & Co. as owners of the flour, and justify as carriers under them; and by the rule of reference this case comes up upon the report of the referee, as upon a special verdict, and there is nothing in the pleadings which will warrant the defendants in attempting to stand upon any rights of the government, and as they stand to the plaintiffs in the light of trespassers, and have no *lien* upon the flour, and had no right to give the bond, it is difficult to see how the defendants could, under Gooderham, Howland & Co., stand upon any supposed rights of the government. If the goods had been stopped while in transit, and the duties paid or secured either before or after the stoppage, the case would have been quite another one.

The court, after a full examination of this case, are all agreed that upon a correct application of the authorities to the facts of the case, judgment should be for the plaintiffs.

Judgment of the county court is reversed, and judgment for the plaintiffs for nominal damages and costs.