E. & G. BROOKE IRON COMPANY *vs.* JOHN B. O'BRIEN.
FIRST NATIONAL BANK OF NEWBURYPORT *vs.* E. & G. BROOKE IRON COMPANY.

Suffolk.   March 19, 20. — Sept. 8, 1883.   DEVENS & W. ALLEN, JJ., absent.

By the terms of a bought and sold note, A. sold a quantity of iron to C. of B., " deliverable at E." The iron was forwarded to E., where it was loaded by C.'s agent upon a vessel chartered by him to carry the iron to B. An invoice of the iron was sent to C., and the iron was deliverable to him by the terms of the bill of lading. While the iron was at E., a bank lent C. a sum of money upon the security of a warehouse receipt issued by a warehouseman in B. to C. On receipt of the bill of lading, C. indorsed it in blank to the warehouseman, who thereupon issued a new warehouse receipt to the bank. On the subsequent arrival of the vessel, the warehouseman, acting as agent for the bank, took possession of the iron. On the day of the arrival of the vessel, C. became insolvent. *Held*, that A. could not subsequently stop the goods *in transitu*.

TWO ACTIONS OF REPLEVIN of a quantity of pig-iron. The cases were tried together in the Superior Court, without a jury,

before *Rockwell,* J., who reported them for the determination of this court, in substance as follows:

The E. & G. Brooke Iron Company, a corporation established under the laws of Pennsylvania, and located at Birdsboro' in that State, on May 16, 1881, by bought and sold notes of that date, " sold to E. P. Cutler and Company, of Boston, Mass.," six hundred tons of pig-iron, " deliverable at Elizabethport, N. J.," and " for immediate delivery," upon the terms of " purchasers' paper at four months, with interest at ninety days, at six per cent per annum."

In pursuance of said contract of sale, the six hundred tons of iron were forwarded by the E. & G. Brooke Iron Company from Birdsboro' to Elizabethport, to E. P. Cutler and Company, in the care of A. B. Hazard, a shipping agent for iron companies at Elizabethport, who received the same, with the way-bills thereof, from the railroad over which the iron came, in several parcels, and had received all the iron by June 2. The E. & G. Brooke Iron Company paid the freight on the iron to Elizabethport, but did not pay Hazard for his services in respect to the iron, although Hazard testified that he expected to get pay for his services from the E. & G. Brooke Iron Company, but it refused payment, and he received no compensation from any one; nor did it appear that said company had anything further to do with the iron until it was replevied by the writ in the first case.

On May 27, 1881, one Engle, a forwarding commission merchant in New York, acting as agent for, and under written instructions, dated May 21, 1881, from, E. P. Cutler and Company, for whom he was agent for storing and shipping iron in May and June, 1881, having received from them an order on one Smith, the freight agent of said railroad at Elizabethport for the delivery of said iron to him, Engle, chartered as agent of Cutler and Company two schooners, and sent them to Elizabethport for the iron. Hazard, acting under written instructions from Engle, immediately loaded three hundred tons of the iron upon each of said vessels. On May 28, 1881, the brokers who had negotiated the sale for the E. & G. Brooke Iron Company, forwarded a bill or invoice of the iron to E. P. Cutler and Company.

On June 4, the iron having been loaded upon the schooners, bills of lading of the iron were signed by the captains of the

schooners, respectively, in triplicate, and one set of the same was immediately forwarded by Engle to E. P. Cutler and Company, at Boston, to whose order the iron was deliverable by the terms of the bills of lading, and was received by them on June 6, 1881. On said day, having received the bills of lading, E. P. Cutler and Company forwarded to the E. G. Brooke Iron Company their four promissory notes, pursuant to the terms of the contract of sale, the notes being received by said company's agents on June 7, 1881.

On May 26, 1881, the First National Bank of Newburyport made a loan of $6000 to E. P. Cutler & Company, upon the security of three hundred tons of said iron, (which had not then reached Boston, but was at Elizabethport,) taking their promissory note of that date, the note reciting that there was deposited as collateral security a warehouse receipt for said three hundred tons. The warehouse receipt referred to was issued by John C. Nichols, a public warehouseman in Boston, on May 25, 1881, and stated that there was "received on storage, for account of Messrs. E. P. Cutler and Company, three hundred tons Brooke pig iron, deliverable to the holder hereof on presentation and surrender of this receipt, legally indorsed, and upon payment of all charges thereon."

On June 7, 1881, said bank made another loan of $6000 to E. P. Cutler and Company, upon the security of the remaining three hundred tons of said iron, taking their promissory note of that date, the iron having been shipped, but not then arrived at Boston, with a similar warehouse receipt.

E. P. Cutler and Company indorsed the bills of lading in blank, and delivered them, one on June 7, 1881, and the other on June 11, 1881, to said John C. Nichols, who had a public warehouse at Fiske's Wharf, the destination of said schooners in Boston, to hold as the agent of the bank, and he thereupon cancelled the old and issued new warehouse receipts for the iron to the bank, having received from the president of the bank verbal authority and instructions to take the iron for the bank upon its arrival.

The schooners with the iron arrived at Fiske's Wharf on June 15, 1881; Nichols went on board both the schooners immediately, and took formal possession of the iron in the name of the bank,

as its agent; and at once proceeded to unload the schooners, one at Fiske's Wharf and the other at Caswell's Wharf, and had unloaded and piled up all the iron upon his wharves and in his warehouses by June 18, 1881.

E. P. Cutler and Company, on June 15, 1881, informed their creditors of their insolvency.

On June 16, 1881, John B. O'Brien, a deputy sheriff, attached the iron, the same being on said wharves and in said warehouses, in actions brought by several creditors of E. P. Cutler and Company against said firm; and he held it there under the attachments when replevied from him by the E. & G. Brooke Iron Company, on June 21, 1881.

On June 24, 1881, the iron was replevied, while still at said wharves and in said warehouses, from the E. & G. Brooke Iron Company by the bank.

On June 20, 1881, one Umberger, with authority from the E. & G. Brooke Iron Company, tendered back to E. P. Cutler and Company, and left at their office, the four promissory notes given by the firm to said company for the iron, and received by said company on June 7, 1881, and kept by it until June 20; and on or about said June 20, Umberger tendered to Nichols the amount of freight and warehouse charges upon the iron, (Nichols having paid the freight for the bank,) and demanded the iron at said wharves, and did all things necessary to make a stoppage *in transitu*, provided the iron was still in transit.

It was contended for the E. & G. Brooke Iron Company that the iron had not reached its destination, and was still in transit, when replevied from the attaching officer, on June 21, 1881; and that the purchase of the iron and the subsequent proceedings in respect thereto were tainted with fraud on the part of E. P. Cutler and Company and of the bank and its president.

The judge found, as facts, that no fraud was proved on the part of E. P. Cutler and Company in the purchase of the iron, and no fraud on the part of the bank in the matter of the loan, but that the purchase and loan were both made in good faith; that, as matter of law, the contract provided for delivery at Elizabethport, N. J., and that delivery was in fact made there; that if the contract should be so construed as to require delivery

in Boston, complete delivery was made there before the first action was brought, and before said tender; and that the attempts of said company to stop the iron *in transitu* were not in time, the iron having previously reached its destination; and ruled that, had such attempts been in fact in time, they were sufficient in law to constitute a valid stoppage *in transitu;* and found for the defendant in the first case, with nominal damages of one dollar, and for the plaintiff in the second case, with nominal damages of one dollar.

If these findings should stand, judgment was to be entered accordingly; otherwise, a new trial to be ordered.

*H. W. Muzzey & W. Emery;* for the E. & G. Brooke Iron Company, cited *Stokes* v. *La Riviere,* 3 T. R. 466; *Ex parte Rosevear China Clay Co.* 11 Ch. D. 560, 568; *Ex parte Golding,* 13 Ch. D. 628; *Rodger* v. *Comptoir d'Escompte,* L. R. 2 P. C. 393; *Ilsley* v. *Stubbs,* 9 Mass. 65; *Naylor* v. *Dennie,* 8 Pick. 198; *Stanton* v. *Eager,* 16 Pick. 467, 476; *Arnold* v. *Delano,* 4 Cush. 33; *Grout* v. *Hill,* 4 Gray, 361; *Mohr* v. *Boston & Albany Railroad,* 106 Mass. 67; *Keeler* v. *Goodwin,* 111 Mass. 490; *Buckley* v. *Furniss,* 15 Wend. 137; *Newhall* v. *Vargas,* 13 Maine, 93.

*H. G. Nichols,* (*B. F. Brooks* with him,) for the bank.

*J. O. Teele,* for O'Brien.

HOLMES, J. It is by no means clear that the findings that there was a delivery of the iron at Elizabethport, or, if the contract required a delivery in Boston, that there was a delivery there before the attempt of the vendors to stop *in transitu,* leave anything open to argument. But if the question is still open to the vendors, we think that no other conclusion could have been reached on the facts reported.

The contracts between the E. & G. Brooke Iron Company, the seller, and E. P. Cutler and Company, the buyers, expressly provided that the goods should be delivered at Elizabethport; the identification of the buyers as of Boston does not affect the place of delivery, or cut down the plain words "deliverable at Elizabethport, N. J." *Dodson* v. *Wentworth,* 4 Man. & G. 1080, 1084, 1088. At Elizabethport the iron was received on board vessels chartered by Cutler and Company, and the *transitus* was at end. With such contracts between the buyer and seller, it

did not matter whether the vessels first mentioned were in the hands of independent carriers, or whether, by the charters, Cutler and Company became owners *pro hac vice*, so that, according to *Berndtson v. Strang*, L. R. 3 Ch. 588, a delivery on board was an actual delivery to them in any event, which, for all that appears, may have been the fact. The cases cited for the Brooke Iron Company throw no doubt upon the rule, that, when goods have reached the destination agreed on between buyer and seller, and are there delivered to the buyer's order, the right of stoppage is gone, and is not revived or prolonged by his ordering them to be despatched to a farther point. *Dixon* v. *Baldwen*, 5 East, 175, 184. *Ex parte Gibbes*, 1 Ch. D. 101. *Ex parte Rosevear China Clay Co.* 11 Ch. D. 560, 569. *Guilford* v. *Smith*, 30 Vt. 49. *Mohr* v. *Boston & Albany Railroad*, 106 Mass. 67, 71.

In the second place, there is equally little question that what took place at Boston would have ended the plaintiff's right to stop, even if Boston had been the place of delivery. We see no reason to doubt that the bank got the interest in the iron which it meant to get as collateral security for its advances to Cutler and Company. But whether it did or not, it took the iron under that claim. The property thus came into the hands of persons claiming as pledgees of the purchaser, holding under his title, and setting up a possession adverse to that of the vendor, with the purchaser's assent, at a place where the vendor contemplated and agreed that it should be done. This was enough to have finished the *transitus*, if it had continued until then, both at law and in equity; and the principle of *Spalding* v. *Ruding*, 6 Beav. 376, 12 L. J. (N. S.) Ch. 503, and *Kemp* v. *Falk*, 7 App. Cas. 573, would not help the vendor, even if this were a proceeding in equity. If the statement that Nichols, the warehouseman, "took formal possession of the iron in the name of the bank as its agent," is to be taken literally, the bank got actual possession through a person acting as its servant for the time being. But the law would be the same if Nichols was a bailee, who himself had the technical possession, setting up an authority derived from the buyer or those claiming under him. As a matter of fact, the fair inference from the report is that he had authority from both Cutler and Company and the bank.

Cases where the goods remained in the hands of the carrier or the carrier's bailee, or some agent or depositary recognizing the vendor, have no application. In this case, they had come completely under the control of the opposite party. See *Hunter* v. *Wright*, 12 Allen, 548.　　　　　*Judgment on the findings.*